IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| COMMUNICATIONS UNLIMITED CONTRACTING SERVICES, INC., | ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | NO. 3:17-cv-01158 JUDGE RICHARDSON |
| v. | ) ) | |
| COMDATA, INC., | ) ) | |
| Defendant/Counter-Plaintiff. | ) | |

**MEMORANDUM OPINION**

Pending before the Court are Defendant's Motion for Summary Judgment as to First Amended Complaint (Doc. No. 74), Defendant's Motion for Summary Judgment as to its Counterclaim (Doc. No. 78), and Plaintiff's Motion for Summary Judgment (as to both Plaintiff's claims and Defendant's Counterclaim) (Doc. No. 85). The parties have filed responses and replies, and the motions are ripe for review.

**BACKGROUND[1]**

Plaintiff, a telecommunications company, employs technicians who perform cable installation services throughout the United States. Defendant is an electronic payment processing company that provides, among other services, MasterCard and fleet management and reporting tools and services.

---

[1] Unless otherwise noted, the facts in this section are taken from facts in the First Amended Complaint that are not disputed and the parties' Responses to Statements of Undisputed Facts (where the facts are undisputed). *See* Doc. Nos. 14, 97, 100, and 101.

Prior to entering into a business relationship with Defendant, Plaintiff reimbursed its cable technicians for the costs of their work-related fuel for the prior week. Plaintiff wanted to switch from this process of reimbursement to the use of fuel cards individually assigned to each technician to cover fuel costs. Plaintiff chose Defendant to implement the new fuel-card program. In February 2016, Plaintiff and Defendant entered into a Comdata MasterCard Corporate Card® Agreement ("the Agreement") (Doc. No. 1-2). Thereafter, Defendant invoiced Plaintiff bi-weekly for fuel-card purchases made by Plaintiff's employees.

The parties strongly dispute whether Plaintiff told Defendant that it wanted its fuel-card program to be set up with *weekly* fuel limits, or whether instead Plaintiff told Defendant it wanted *daily* fuel limits. The final master set-up template governing Plaintiff's fuel-card program ("Final Card Template")[2] was set up with daily limits. (Doc. No. 74-10). Plaintiff blames Defendant for this "mistake," and Defendant asserts that it was doing what Plaintiff told it to do.

More than a year after the Agreement was signed and Plaintiff's fuel-card account was opened, Plaintiff discovered a card account on which a technician made four separate card purchases, totaling $100 during a single week, despite the card being set up with a $25 limit. Plaintiff advised Defendant that the fuel-card program was set up incorrectly and that the preset limits should have been set up with a weekly spend limit per card instead of a daily spend limit.[3]

---

[2] Plaintiff does not identify the Final Card Template as a "contract" upon which it brings its claims. Defendant asserts that the Agreement and Final Card Template collectively constitute the written contractual documents governing the set-up, terms and conditions of Plaintiff's account with Defendant (Doc. No. 76 at 10), but it points to no document which states this. Although it is a written document, the Final Card Template is not signed by the parties and is not included in Plaintiff's definition of "Agreement." (*See* Doc. Nos. 14, 1-2 and 74-10).

[3] Plaintiff also contends that it intended the card to be used for fuel purchases only and that nevertheless technicians were able to use the card for non-fuel purchases.

On March 31, 2017, at Plaintiff's request, Defendant changed the spend limits on the cards from daily to weekly. With those changes to the spend-limit cycles, Plaintiff and Defendant continue to operate together under the Agreement.

This lawsuit involves Plaintiff's claims against Defendant for breach of contract and state-law torts, as well as Defendant's counterclaim for declaratory judgment. The parties have now moved for summary judgment on Plaintiff's claims and Defendant's counterclaim. Specifically, each party has moved for summary judgment on its own claim(s) and for summary judgment on the opposing party's claim(s).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.

3

*Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at ** 5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

**BREACH OF CONTRACT**

The Agreement provides that it is governed by Tennessee law. (Doc. No. 1-2 at 4). To establish a breach-of-contract claim, a plaintiff must show (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of that contract, and (3) damages caused by the breach. *Thomas v. Meharry Medical College*, 1 F. Supp. 3d 816, 828 (M.D. Tenn. 2014).

The existence of an enforceable contract does not seem to be disputed. The First Amended Complaint defines the "Mastercard Agreement," which appears to be the only "agreement" (or at least the only written "agreement") upon which Plaintiff sues for breach,[4] as the Comdata MasterCard Corporate Card® Agreement. (Doc. No. 14 at ¶ 10). Even though Defendant appears to treat the Final Card Template as an agreement, as noted above, it is not a contract and not included as part of the "Mastercard Agreement" (a/k/a "Agreement") defined by the First Amended Complaint.[5] The Agreement itself states that it consists of "(i) this cover page, (ii) the General Terms and Conditions attached hereto, and (iii) the Fee Schedule attached hereto (collectively, the "Agreement"). (Doc. No. 1-2 at 1).[6]

---

[4] After coining the term "Mastercard Agreement" in the First Amended Complaint (Doc. No. 14 at ¶ 10), Plaintiff uses the undefined term "Agreement" to the exclusion of the term "Mastercard Agreement," thus indicating both that the two are one and the same and that this "Agreement" is the sole agreement underlying Plaintiff's claims.

[5] In any event, the language of the Final Card Template does not suggest any obligation of Defendant, or any agreement of the parties, to set up spend limits that are weekly instead of daily or fuel cards that are for fuel purchases only. (Doc. No. 74-10).

[6] At Doc. Nos. 8 and 28, the Agreement has been filed under seal, with no motion to seal or Court order authorizing the filing under seal. At other places on the docket (*e.g.*, Doc. Nos. 1-2, 74-11 and 104-3), the Agreement is filed but not under seal. Section 11 of the Agreement provides that the parties shall not disclose to any third party the rates, terms and conditions of the Agreement. (Doc. No. 1-2 at 3). However, because the Agreement has been publicly filed at least three times and Defendant did not request an Order allowing it to file the Agreement under seal, the Clerk is directed to unseal Docket Nos. 8 and 28.

Plaintiff insists that it clearly told Defendant to set up this fuel-card program with weekly limits and cards for fuel purchases only, and Defendant claims that Plaintiff never gave such instructions and, instead, asked for daily limits. *See, e.g.,* Doc. No. 97 at ¶¶ 3-6, 8, 12-16, 23, 40, 48, and 62; Doc. No. 100 at ¶¶ 14 and 15. The Agreement says *nothing* about spend limits, either weekly or daily, and *nothing* about fuel-only purchases. (Doc. No. 1-2).

Plaintiff fails to point to any specific provision in the Agreement that Defendant breached. Nonetheless, the First Amended Complaint alleges that "[a]t the time of entering into the Agreement with the Plaintiff, the Defendant contracted with the Plaintiff to implement, monitor, and maintain Fuel Costs with a 'fuel only' *weekly* charge limit and not a *daily* charge limit." (Doc. No. 14 at ¶ 24) (emphasis in original). The Court can find nothing in the Agreement that imposes such an obligation.

Alleging simply that Defendant "failed to perform the consideration that was the basis of the contract," Plaintiff claims that Defendant breached the contract. (Doc. No. 98 at 13). Plaintiff asserts that Defendant "guaranteed" that Plaintiff's fuel cards would be properly set up on a weekly basis, but Plaintiff points to nothing in the Agreement that makes such a guarantee. (*Id.* at 14). Plaintiff also asserts that Defendant breached its agreement to properly set up Plaintiff's account in the manner it had contracted to and failed to monitor same; but again, Plaintiff cites no specific provision of the Agreement which required this of Defendant. (*Id.* at 21).

In interpreting a contract, the role of the court is to ascertain and give effect to the intent of the parties. *Spirit Broadband, LLC v. Armes*, No. M2015-00559-COA-R3-cv, 2017 WL 384248 at * 6 (Tenn. Ct. App. Jan. 27, 2017) (citing *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009)). The task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*,

78 S.W.3d 885, 889-90 (Tenn. 2002). If the language of the contract is clear and unambiguous, the literal meaning controls the outcome of the dispute. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). The interpretation should be one that gives reasonable meaning to all provisions of the agreement, without rendering portions of it neutralized or without effect. *Id.*

Here, however, the Agreement says nothing about the issues of spend-limit cycles, and each party relies upon evidence outside the Agreement to argue the intent and agreement of the parties with regard to how this fuel-card program was supposed to be set up. Plaintiff suggests, without actually saying, that the Court decide the issue based on alleged oral agreements that are outside the Agreement, but are related to the services provided under the Agreement. Defendant contends that Plaintiff has failed to allege what specific terms of the Agreement it claims Defendant breached, and Defendant relies upon the Final Card Template and testimony from its employees to assert that the fuel-card program was set up as Plaintiff instructed.

Where a contract is ambiguous, the Court may look beyond the four corners of the document in order to determine the parties' intentions, which are determined from not only the language of the contract, but also from the surrounding facts and circumstances. *Cummings, Inc. v. Dorgan*, 320 S.W.3d 316, 333 (Tenn. Ct. App. 2009). But this contract is not ambiguous about the spend limit cycles; it is *silent* about those cycles.

Since courts should not look beyond a written contract when its terms are clear, the parole evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract. *First Tenn. Bank Nat'l Ass'n v. Bad Toys, Inc.,* 159 S.W.3d 557, 563 (Tenn. Ct. App. 2004); *People First of Tenn. v. Clover Bottom Dev.* Center, 753 F. Supp. 2d 701, 709 (M.D. Tenn. 2010). But here, the testimony concerning the intention of the parties and alleged oral agreement as to the spend-limit cycles and fuel-only

7

purchases does not vary or contradict the contract language. It provides specifics about how Defendant allegedly was to provide its services to Plaintiff, specific obligations allegedly to be undertaken by Defendant in setting up Plaintiff's fuel-card program. In other words, the parole evidence provides specifics as to how the general terms of the Agreement were supposed to be carried out.

The parole evidence rule does not prevent using extraneous evidence to prove the existence of an independent or collateral agreement not in conflict with a written contract. *First Tenn. Bank*, 159 S.W.3d at 565, *cited in Lewis v. Labor Ready Mid-Atlantic, Inc.*, No. 3:08-1085, 2009 WL 497692, at * 5 (M.D. Tenn. Feb. 26, 2009). [7] Plaintiff's First Amended Complaint alleges that Defendant "contracted" with Plaintiff to implement, monitor, and maintain the fuel cards with a "fuel only," weekly charge limit, not a daily charge limit. (Doc. No. 14 at ¶ 24). Because the written Agreement says nothing about this alleged "contract," the Court will construe Plaintiff's claims as alleging a separate, oral agreement. Because nothing about this alleged oral agreement or oral "contract" *conflicts* with the written Agreement, the Court may consider extraneous evidence to prove the existence of any independent, collateral, oral agreement(s).[8] The Court construes Plaintiff's breach of contract claim, therefore, as based on an alleged breach of one or more alleged oral agreements, not an alleged breach of the written Agreement, since the Agreement does not

---

[7] Even though the Agreement includes a "merger clause," a provision stating that it constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior agreements and understandings, oral or written, of the parties with respect to the subject matter (Doc. No. 1-2 at 4), the Agreement does not include, within "its subject matter," anything concerning how to set up the fuel-card program (with weekly limits and for fuel purchases only, or otherwise).

[8] Defendant has not challenged (indeed, neither side has addressed) the offer, acceptance or consideration required to show a valid oral "contract." For purposes of summary judgment, the Court assumes those elements are not disputed.

address spend-cycle limits or fuel-only purchases at all. These alleged oral agreement(s) do not vary, contradict, or construe the terms of the written Agreement and, thus, may be asserted by Plaintiff despite the parole evidence rule.

No one denies that Defendant set the fuel-card spend cycle as daily. That is not the issue; the issue is whether Plaintiff told Defendant to set the cycle limit as weekly, which is a genuine and material issue of fact. Defendant's Implementation Specialist, Ms. Ellis, testified that she set up the Final Card Template based upon conversations with two of Plaintiff's employees, Elrod and Cleckler, who told her Plaintiff wanted *daily* fuel limits. (Doc. No. 74-9 at 4-5 (Dep. at 26-27) and at 11-12 (Dep. at 38 and 40)). On the other hand, Plaintiff's President (Miller) and employee (Elrod) insist that they told Defendant they wanted fuel cards with *weekly* fuel limits. (Doc. No. 88-3 at 63 (Dep. at 63)); Doc. No. 89-2 at 34 (Dep. at 33)). Elrod testified that he saw the Final Card Template and "would have" seen the "daily" cycle type listed thereon (Doc. No. 89-2 at 62 (Dep. at 63)), but he stated he thought that "daily" pertained to "swipes per day." (*Id*. at 63 (Dep. at 64)). Plaintiff argues that Defendant has produced no documents showing that Plaintiff requested daily limits, but Plaintiff has presented no documents showing that it requested weekly limits either. With cross-motions for summary judgment, each party bears the initial burden of pointing to evidence tending to show the absence of a genuine issue of material fact.

Each party asserts that the other party was at fault. Plaintiff claims that Defendant, misrepresenting to Plaintiff that the spend limits would be set up on a weekly basis, set the spend limits incorrectly. Defendant avers that not only did Plaintiff not request weekly limits, but also Plaintiff was negligent in not reviewing the Final Card Template and invoices for accuracy to see (at least before a year had elapsed) if everything was set up as Plaintiff wanted it to be. (Doc. No. 97 at ¶ 22 and No. 101 at ¶¶ 23-28). Defendant contends that Plaintiff could have prevented the

alleged harm by reviewing the Final Card Template before signing the Agreement, by reviewing the invoices Defendant sent for the first year, or by monitoring the fuel cards' use. There is a genuine issue of material fact as to whose actions or inactions caused the fuel-card program to be set up with daily limits and for purchases not limited to fuel. A more obvious example of a "he said, she said" dispute would be difficult to find, as even Defendant admits. (Doc. No. 96 at 3).

Given the lack of guidance in the Agreement concerning spend-limit cycles or fuel-only purchases, the contradictory testimony as to the intent of the parties, and the only written reference to "daily" vs. "weekly" limits being on a form template (not in a contract), the Court finds that there are genuine issues of material fact as to the parties' intentions with regard to the spend-limit cycles and limits on purchases, precluding summary judgment for either party on the breach of contract claim. There are issues, for example, about what Plaintiff told Defendant it wanted; whether Defendant "guaranteed" anything and, if so, what; whether Plaintiff should have reviewed the Final Card Template and invoices more carefully; and how Plaintiff was damaged by the alleged breach.[9]

## **DEFENSES**

Defendant argues that certain provisions of the Agreement preclude Plaintiff's breach of contract claim for damages. Defendant points to Section 8 of the Agreement, which states, in part: "Unless required by law, Comdata is not responsible for any problem Customer may have with

---

[9] Moreover, as noted above, to establish a breach of contract claim, a plaintiff must show the existence of an enforceable contract, *Thomas v. Meharry Medical College*, 1 F. Supp. 3d 816, 828 (M.D. Tenn. 2014), and there are genuine issues of material fact concerning the existence and enforceability of Plaintiff's alleged oral agreement (*e.g.*, offer, acceptance, and consideration) that have not been addressed and will have to be determined at trial.

any goods or services charged on the Account." (Doc. No. 1-2 at 3).[10] Plaintiff argues that this portion of Section 8 is limited to situations where Plaintiff is disputing a charge with a merchant. This section is applicable only to problems with "goods and services *charged on the Account*." "Account" is defined at the beginning of the Agreement as "one or more accounts through the use of which Customer [Plaintiff] may access certain said networks ("Networks") and the financial information and other services provided for in this Agreement and any Schedules attached hereto." (*Id*. at 2).

Given the Agreement's definition of "Account," this portion of Section 8 concerning "any goods or services charged on the Account" reasonably could mean services charged by Defendant to Plaintiff for providing Defendant's services. On the other hand, a reasonable jury alternatively could find that this provision relates to goods (ordinarily fuel) or services charged by Plaintiff's technicians on the card at a merchant's location, such as the charges at issue here. The Court finds that there are factual issues precluding summary judgment on the interpretation of this portion of Section 8.

Section 8 of the Agreement also provides that Plaintiff must notify Defendant in writing of any disputed item on Plaintiff's billing statement within sixty days from the date of the billing statement or it will be deemed undisputed and accepted by Plaintiff. (Doc. No. 1-2 at 3). This section is different from the one in the preceding paragraph in that it clearly applies to Defendant's "billing statements" to Plaintiff. Plaintiff notified Defendant on March 28, 2017, of a dispute related to Defendant's services invoiced and billed to them when it discovered that the program

---

[10] Section 8 goes on to say that if "Customer has a dispute with a merchant, Customer must pay Comdata and attempt to resolve the dispute with the merchant prior to sending the dispute to Comdata." (Doc. No. 1-2 at 3).

set daily spend limits instead of weekly limits. Thus, all items on billing statements prior to sixty days before March 28, 2017, are deemed accepted. To the extent Plaintiff proves it is entitled to some recovery, Plaintiff will be limited to recovery for charges reflected on billing statements only as far back as sixty days before March 28, 2017.

Defendant also cites to Section 10 of the Agreement, a limitation of liability provision that provides that Comdata's sole responsibility, and Plaintiff's sole remedy, for damages for "error, delay, or any action or failure to act" shall be limited to "direct money damages in an amount not to exceed the total amount paid by [Plaintiff] with respect to the defective service causing the damage during the twelve months immediately preceding the loss." (Doc. No. 1-2 at 3). In addition, Section 10 states: "[e]xcept as otherwise set forth herein, in no event shall either party be responsible for indirect, consequential, special, incidental or punitive damages, regardless of whether such party was made aware of the possibility of such damages." (*Id.*).

Plaintiff's defense to the application of Section 10 is that it is unconscionable. An unconscionable contract is one in which the provisions are so one-sided, in view of all the facts and circumstances, that the contracting party is denied an opportunity for meaningful choice. *Barron v. PGA Tour, Inc.*, 670 F. Supp. 2d 674, 686 (W.D. Tenn. 2009). The Tennessee Supreme Court has described substantive unconscionability as existing when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other. *Id*. (citing *Taylor v. Butler*, 142 S.W.3d 277, 285 (Tenn. 2004)).

The Court finds nothing in Section 10 of this Agreement that is so unequal or oppressive as to shock the judgment of a person of common sense. Plaintiff has not cited any authority for

12

why it believes this provision to be unconscionable or identified any specific words or phrases within the provision that could make the language unconscionable. Plaintiff signed the Agreement and has not alleged that Section 10 was somehow hidden or not available for its review prior to entering into the Agreement. Moreover, this provision is not one-sided. *Both* parties have limited liability under Section 10. Moreover, a limitation of liability benefiting a service provider like Defendant well may benefit the other side by enabling it to receive lower service fees precisely because the service provider was able to mitigate its risk via limitation of liability.

The Court finds that the limitation of liability provision (Section 10) in the Agreement is not unconscionable. Plaintiff may not ignore the contract that it agreed to, signed, and benefitted from. Plaintiff had notice of all terms of the Agreement, including this limitation of liability provision. Accordingly, the Court finds that the parties are bound by Section 10 and, therefore, neither party shall be responsible for indirect, consequential, special, incidental or punitive damages in this matter. (Doc. No. 1-2 at 3). In addition, Defendant's sole responsibility and Plaintiff's sole remedy for damages in this case for error, delay, or any action or failure to act shall be limited to "direct money damages in an amount not to exceed the total amount paid by Plaintiff with respect to the defective service causing the damage during the twelve months immediately preceding the loss." (*Id.*) Further interpretation of that provision is not before the Court at this time.

Thus, as to Defendant's defenses based on the Agreement itself, summary judgment will be denied to Defendant as to the first part of Section 8 concerning problems with goods or services charged on the account. Summary judgment will be granted in part to Defendant as to the second part of Section 8, such that any recovery by Plaintiff will be limited to items that were billed within sixty days of March 28, 2017. In addition, summary judgment will be granted to Defendant as to

13

Section 10, such that any damages claimed by Plaintiff will be limited to direct money damages in an amount not to exceed the total amount paid by Plaintiff with respect to the allegedly defective service causing the damage during the twelve months preceding the loss. Finally, neither party hereto may recover (in this action) "indirect, consequential, special, incidental, or punitive damages."

## DECLARATORY JUDGMENT

In its Counterclaim, Defendant asks the Court to declare that Plaintiff must indemnify Defendant pursuant to Section 12 of the Agreement, which provides that Plaintiff agrees to hold Comdata harmless from any and all liability resulting from the acts of any employee or agent of Plaintiff, including negligent acts, willful misconduct, and breach of Plaintiff's obligations under the Agreement. (Doc. No. 1-2 at 3). In addition, Defendant asks the Court to declare that it is entitled to recoup fees and expenses pursuant to Section 21(n) of the Agreement, which provides that in the event that "the Account is turned over to a collection agency or an attorney for collection of unpaid amounts or otherwise to enforce this Agreement, Customer agrees to pay all costs, fees and expenses of such agency or attorney, including, without limitation, court costs and out-of-pocket expenses." (Doc. No. 1-2 at 4).

Even if Defendant somehow had established the correctness of its position on these sections, the Court would decline at this stage to grant Defendant the relief it seeks. A declaratory judgment is quintessentially a remedy within the district court's discretion. *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, 16 F. App'x 433, 437 (6th Cir. 2001). This is especially true at the current summary judgment stage of the case, where aspects of the case are still headed to trial.

The Declaratory Judgment Act provides that in a case of actual controversy within its jurisdiction, any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration. 28 U.S.C. § 2201. "The Declaratory Judgment Act empowers the district court to entertain certain actions, but it does not compel the court to exercise the jurisdiction thus granted to it." *Zide*, 16 F. App'x at 437. Discretion not to hear a declaratory judgment action, even where jurisdiction exists, is undisputed. *Id*. Where a court has the power to grant declaratory relief as to an actual controversy, the court nevertheless retains discretion to deny such relief. *Fusco v. Rome Cable Corp.*, 859 F. Supp. 624, 634 (N.D. N.Y. 1994).

The Court cannot conclude the declaratory relief is needed or appropriate yet, if ever it may be. If Defendant wanted a less discretionary form of relief—such as a monetary award—it should have pled its Counterclaim that way. It did not. Defendant is not entitled as a matter of law at this time to the declaratory relief it seeks, and its Motion for Summary Judgment on its Counterclaim will be denied.

Although Plaintiff asks the Court to grant it summary judgment on Defendant's Counterclaim, Plaintiff does not address either declaratory judgment or the provision of the Agreement at issue in the Counterclaim. Thus, Plaintiff's Motion for Summary Judgment, to the extent it deals with Defendant's Counterclaim, will also be denied.

## **BREACH OF WARRANTY**

Plaintiff contends that Defendant contracted with Plaintiff to provide "goods" under the Uniform Commercial Code ("UCC") and gave an express warranty by promising that it would provide, implement, maintain and monitor the fuel cards in accordance with Plaintiff's needs. The Court finds no such warranty in the Agreement. In fact, Section 10 of the Agreement states:

"Comdata makes no representation or warranties, whether express or implied, including any warranties of merchantability or fitness for a particular purpose." (Doc. No. 1-2 at 3). Plaintiff has not identified any portion of the Agreement that constitutes a warranty of any kind. Plaintiff merely argues, in conclusory fashion, that Defendant "warranted" that it would provide Plaintiff with fuel-only cards with a weekly limit and not a daily limit and failed to do so. (Doc. No. 98 at 23). This allegation is simply a reiteration of Plaintiff's breach of contract claim, dressed up in other clothes, and is insufficient to establish the existence of a warranty.

Moreover, although the Agreement happens to mention "goods" in particular contexts, the transactional relationship between Plaintiff and Defendant is one whereby Defendant provides only services, not goods, to Plaintiff. Therefore, this case is not governed by the UCC, which (axiomatically) applies to transactions in *goods,* not contracts for the provision of services. Plaintiff's response fails to rebut Defendant's correct assertion that this Agreement (and, for that matter, the alleged oral agreements) relates almost exclusively to the provision of services, not the sale of goods. As to the breach of warranty claim, the Court finds that no genuine issues of material fact exist and that Defendant is entitled to judgment as a matter of law because Plaintiff has failed to identify any warranty to overcome the specific disclaimer in Section 10 of the Agreement.

Accordingly, the Court will grant Defendant summary judgment on Plaintiff's breach of warranty claim.

## **FRAUD/MISREPRESENTATION/PROMISSORY FRAUD**

Defendant asserts that Alabama law applies to Plaintiff's tort claims. Plaintiff's response to this issue is contradictory, confusing, and lacking any analysis. (Doc. No. 98 at 23-24). Alabama law provides that, with the exception of insurance contracts, a failure to perform a contractual obligation is not a tort. *Franklin v. City of Homewood*, Case No. 2:07-cv-006, 2009 WL 10703684,

at * 8 (N.D. Ala. May 20, 2009). Alabama law does not recognize a cause of action sounding in tort for the breach of a duty created by contract. *Griggs v. Kenworth of Montgomery, Inc.*, Case No. 2:16-cv-406, 2019 WL 7190610, at * 6 (M.D. Ala. Dec. 26, 2019); *McClung v. Mortg. Elec. Registration Sys., Inc.*, No. 2:11-cv-03621, 2012 WL 1642209, at * 7 (N.D. Ala. May 7, 2012). A mere failure to perform a contractual obligation is not a tort. *Blake v. Bank of America*, 845 F. Supp. 2d 1206, 1210 (M.D. Ala. 2012) (citing *Barber v. Business Prods. Ctr.*, 677 So. 2d 223, 228 (Ala. 1996)). A plaintiff can sue in tort only when a defendant breaches the duty of reasonable care (the duty one owes to another in his day-to-day affairs) and when such a breach causes personal injury or property damage. *Blake*, 845 F. Supp. 2d at 1210.

Tennessee law is not different. It is well settled under Tennessee law that a tort cannot be predicated on a breach of contract. *Town of Smyrna, Tenn. v. Mun. Gas Auth. of Ga.*, 129 F. Supp. 3d 589, 605 (M.D. Tenn. 2015). A tort can exist only if a party breaches a duty which he owes to another independently of the contract. *Id*.; *Calipari v. Powertel, Inc.*, 231 F. Supp. 2d 734, 736 (W.D. Tenn. 2002) ("The Tennessee Supreme Court has held that willful breach of contract does not transform a breach of contract into a tort.").

In Count 2 of the First Amended Complaint, Plaintiff alleges that Defendant "contracted" with Plaintiff "to provide, implement, monitor, and maintain Fuel Cards with a 'fuel only' charge limit of a *weekly* limit and not a *daily* limit." Plaintiff alleges that it relied upon that "misrepresentation" and that as a result of Defendant's misrepresentations and fraud, Plaintiff suffered monetary damages. (Doc. No. 14 at ¶¶ 29-32). As noted above, nothing in the Agreement sets forth this alleged "contract" or creates this specific alleged obligation. Moreover, it is hotly disputed whether Defendant made any such specific oral representation to Plaintiff.

The underlying basis for Plaintiff's fraud/misrepresentation claim is the alleged oral agreement to provide, implement, monitor, and maintain fuel cards with "fuel only" and weekly limits. (Doc. No. 14 at ¶ 29). That is, Defendant allegedly committed "fraud" or "misrepresentation" by breaching a provision of an alleged oral agreement. Absent more, such as an allegation that Defendant never intended to comply with the alleged agreement in the first place, Plaintiff has only a contract claim, not a tort claim. Under either Tennessee or Alabama law, this tort claim is simply not cognizable on this basis because it is a reiteration of Plaintiff's contract claim. Thus, without pausing to determine which state's law applies, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's fraud/misrepresentation claim.

## **CONVERSION**

Under Tennessee law, "conversion" is the appropriation of another's property to one's own use and benefit, by the exercise of dominion over the property, in defiance of the owner's right to the property. *Bowers v. Estate of Mounger*, 542 S.W.3d 470, 485 (Tenn. Ct. App. 2017). Conversion is an intentional tort, and the party seeking to make out a *prima facie* case of conversion must prove: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. *PNC Multifamily Capital Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012).

Again, Plaintiff's claim is based upon the alleged breach of the alleged underlying oral agreement between these parties. Plaintiff's claim for conversion is basically another re-casting of its contract claim. As with the fraud/misrepresentation claim, Plaintiff's conversion claim cannot stand, given its factual underpinning. Defendant's Motion for Summary Judgment on the conversion claim will also be granted.

18

## TENNESSEE STATUTES NOT PLED

In response to Defendant's Motion for Summary Judgment as to Plaintiff's First Amended Complaint, Plaintiff raised two new claims based upon state statutes—procurement of breach of contracts (Tenn. Code Ann. § 47-50-109) and Tennessee Consumer Protection Act (Tenn. Code Ann. § 47-18-109)—neither of which was pled in Plaintiff's First Amended Complaint. There has been no motion to amend the First Amended Complaint, and Plaintiff cannot raise new claims in this way.

"A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2723 (3d ed. Supp. 2005); *Tucker v. Union of Needletrades, Indus. and Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). Parties who seek to raise new claims at the summary-judgment stage must first move to amend their pleadings under Fed. R. Civ. P. 15(a) before asserting the new claims in summary-judgment briefing. *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019).

Accordingly, Plaintiff's arguments concerning alleged violations of these two statutes have not been and will not be considered by the Court.

## CONCLUSION

For all these reasons, Defendant's Motion for Summary Judgment (Doc. No. 74) will be granted in part and denied in part. Plaintiff's claim for breach of contract will proceed to trial but will be limited to charges reflected on billing statements after January 16, 2017, and to "direct money damages in an amount not to exceed the total amount paid by Plaintiff with respect to the

defective service causing the damage during the twelve months immediately preceding the loss." Neither party may recover from the other "indirect, consequential, special, incidental, or punitive damages." In addition, Plaintiff's claims for breach of warranty, fraud/misrepresentation, and conversion will be dismissed.

Defendant's Motion for Summary Judgment on its Counterclaim (Doc. No. 78) will be denied, and Plaintiff's Motion for Summary Judgment (Doc. No. 85) will be denied.

An appropriate Order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE